## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

LACI BARCLAY,

      Plaintiff,

v.

Warden RYAN LONG,
Captain KATHY MESTAS,
Sergeant WOOD,
Captain WILCOXIN
Captain DAVIS,
Major TIMOTHY McCARTHY,
Officer M. JOHNSON, and
Doctor JAMIE (last name unknown),

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Laci Barclay, by and through their[1] attorneys at the Civil Rights Litigation Group, hereby submits this Complaint and Jury Demand, alleging as follows:

### INTRODUCTION

1.    Plaintiff Barclay brings this civil rights action seeking justice for an attack by another incarcerated person—who threw boiling hot water and petroleum jelly on Barclay's face, resulting in severe, third-degree burns and permanent disfigurement—after officials at Denver Women's Correctional Facility endangered Plaintiff by labeling Plaintiff a "snitch;" were provided

---

[1] Plaintiff Barclay uses the pronouns "they," "them," and "theirs."

advance notice of the means, timing, and people involved in the impending attack; and each Defendant failed to take reasonable measures to protect Plaintiff Barclay.

2.     Further, the medical provider responsible for Plaintiff Barclay's care following this horrific attack negligently failed to treat Plaintiff's burns or appropriately secure additional professional medical aid for Plaintiff. Because of this negligence, Plaintiff Barclay sat in excruciating pain—continuing to burn—for hours after the attack, and injuries that could have been limited to second-degree burns, increased in severity to third-degree burns.

3.     The defendant officers' conduct and omissions—those officers' deliberate indifference to Plaintiff Barclay's health, safety, and significant risk of serious harm—endangered Plaintiff, caused Plaintiff psychological distress as they feared for their safety, and ultimately resulted in Plaintiff being subjected to the very harm they had warned was likely to befall them without Defendants' intervention. The defendant medical provider's negligence, meanwhile, extended and increased the severity of Plaintiff Barclay's injuries, as well as their pain and suffering. Plaintiff Barclay seeks compensation for physical and emotional harm, pain and suffering, and economic damages, as well as punitive sanctions against the Defendants to punish and deter their blatant abuse of authority, dereliction of duty, and violation of Plaintiff Barclay's rights.

## JURISDICTION AND VENUE

4.     Plaintiff's federal claims are brought pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

5.     Plaintiff's state law claim is brought pursuant to Colorado common law.

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

7.     This court has supplemental subject matter jurisdiction over the state law claim

pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in the District of Colorado, pursuant to 28. U.S.C. § 1391(b)(2) because all the events alleged herein and which give rise to this action occurred in the State of Colorado.

9.      Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

## PARTIES

10.     Plaintiff incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

11.     Plaintiff Laci Barclay was, at all times relevant to the claims set forth herein a resident of the State of Colorado and was incarcerated in the Colorado Department of Corrections' Denver Women's Correctional Facility ("DWCF").

12.     Defendant Ryan Long was, at all times relevant to this Complaint, employed by the Colorado Department of Corrections ("CDOC") as the warden of DWCF and acting under color of state law. He is identified in his individual capacity.

13.     Defendant Kathy Mestas was, at all times relevant to this Complaint, employed by CDOC as a captain at DWCF and acting under color of state law. She is identified in her individual capacity.

14.     Defendant Wood was, at all times relevant to this Complaint, employed by CDOC as a sergeant at DWCF and acting under color of state law. He is identified in his individual capacity.

15.     Defendant Wilcoxin was, at all times relevant to this Complaint, employed by

CDOC as a captain at DWCF and acting under color of state law. He is identified in his individual capacity.

16.     Defendant Davis was, at all times relevant to this Complaint, employed by CDOC as a captain at DWCF and acting under color of state law. He is identified in his individual capacity.

17.     Defendant Timothy McCarthy was, at all times relevant to this Complaint, employed by CDOC as a major at DWCF and acting under color of state law. He is identified in his individual capacity.

18.     Defendant M. Johnson was, at all times relevant to this Complaint, employed by CDOC as a corrections officer at DWCF and acting under color of state law. He is identified in his individual capacity.

19.     Defendant Jamie, whose last name is currently unknown, was, at all times relevant to this Complaint, employed by a private medical provider contracted to provide care to those incarcerated at DWCF. At all relevant times, Defendant Jamie was acting under color of state law as a government contractor. She is identified in her individual capacity. Despite reasonable diligence, including requests for information from CDOC, Plaintiff has been unable to determine Defendant Jamie's last name. Plaintiff will amend this complaint to include Defendant Jamie's full name once it is discovered through initial disclosures or discovery.

## FACTUAL ALLEGATIONS

20.     Plaintiff Barclay incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

21.     Plaintiff Barclay was incarcerated at DWCF from December 29, 2019, to October

12, 2023.

22.     DWCF—Denver Women's Correctional Facility—is a CDOC facility located in Denver, Colorado.

23.     DWCF houses incarcerated people of all custody levels: minimum custody, minimum restricted custody, medium custody, and close custody.

24.     In October of 2022, Plaintiff Barclay was assigned to Housing Unit 5D; at this time, their custody level was medium.

***The Beginning of Plaintiff Barclay's Interactions with Members of the Bloods at DWCF***

25.     It was in Housing Unit 5D that Plaintiff Barclay began regularly encountering Shanice Smith and Estella Toleafoa, who were also assigned cells in Housing Unit 5D.

26.     Ms. Smith and Ms. Toleafoa were known to be members of the gang, "the Bloods."

27.     Plaintiff Barclay's August 2023 attacker, Tore Harrison, was also a member of the Bloods.

28.     Plaintiff Barclay was (and is) not a member of the Bloods, nor was (or is) Plaintiff affiliated with any gang.

29.     As a result of Plaintiff's lack of affiliation and lack of desire to be around a gang of persons who had a reputation for violence, Plaintiff Barclay avoided spending time with either Ms. Smith or Ms. Toleafoa.

30.     In January of 2023, Plaintiff Barclay began participating in CDOC's Prison Education Program by enrolling in and subsequently attending college-level courses. Plaintiff received a Pell grant to take these classes and was working toward their associate degree in applied

technology.

31.     Ms. Smith attended the same classes.

32.     In April and May of 2023, Ms. Toleafoa pursued Plaintiff Barclay as a sexual partner.

33.     Plaintiff Barclay rebuffed Ms. Toleafoa's sexual advances, and so both Ms. Toleafoa and Ms. Smith became increasingly antagonistic toward Plaintiff Barclay.

***Threats to Plaintiff Barclay Escalate in Early 2023, and Defendant Long is Notified***

34.     By mid-May 2023, the acrimonious relationship between Plaintiff Barclay and both Ms. Toleafoa and Ms. Smith had continued to escalate.

35.      Ms. Smith distracted and scared Plaintiff Barclay during their shared classes by threatening that she and/or others associated with the Bloods would harm Plaintiff Barclay, including by boiling water in a microwave and throwing it on Plaintiff Barclay.

36.     As Ms. Smith, Ms. Toleafoa, Ms. Harisson, and the defendant officers were aware, a few months prior, one incarcerated woman (Courtney Plant) had severely burned another (Adrian Stone) by boiling a cup of water in a microwave in the close custody unit and throwing it on her (Ms. Stone).

37.     All of the defendant corrections officers knew about that prior incident and knew that the people incarcerated at DWCF spoke of using microwaved boiling hot water against others as a means of causing harm.

38.      The defendant officers did nothing to monitor the microwave area, restrict access to those who might use it for nefarious purposes, or otherwise ensure microwaved substances

would not be used as a weapon in the future.

39.    Plaintiff Barclay told their mother of these threats and of their fear during regular telephone calls.

40.    Plaintiff Barclay's mother, in turn, emailed Defendant Long at 7:41 p.m. on May 18, 2023, asking him to protect her child, and informing him that Ms. Smith had threatened to use a microwave to boil water and throw it on Plaintiff Barclay.

41.    Less than twelve hours later, at 6:45 a.m. on May 19, 2023, Defendant Long responded to the email dismissing this warning and its associated request for protection, writing that there was "no evidence to support [Barclay's] claims," even though neither he nor his staff ever spoke with Plaintiff Barclay about the threats Plaintiff had received.

***The July 2023 Attack on Plaintiff Barclay***

42.    On July 15, 2023, Ms. Toleafoa attacked Plaintiff Barclay in Plaintiff's cell by hitting Plaintiff on the head with a coffee pot.

43.    The next day, on July 16, 2023, corrections officers searched Plaintiff Barclay's cell.

44.    In connection with the July 16, 2023, cell search, Plaintiff Barclay received a write-up for disobeying a lawful order during the search.

45.    The July 16, 2023, write-up added points to Plaintiff Barclay's custody designation such that they would be forced to move to close custody.

***The Cell Transfer within Unit 5 & Defendant Mestas' Labeling Plaintiff Barclay a "Snitch"***

46.    The defendant officers—made aware of Ms. Toleafoa's July 15 attack—moved

Plaintiff Barclay from Housing Unit 5D to Housing Unit 5B.

47.    A lieutenant at DWCF, Lieutenant Ruiz, told Plaintiff Barclay that Plaintiff was being moved to Housing Unit 5B to separate them from Ms. Toleafoa and Ms. Smith.

48.    Plaintiff Barclay then informed him that Plaintiff would continue to be targeted for attack by Ms. Toleafoa, Ms. Smith, and their associates—that Plaintiff Barclay had been threatened with serious harm regardless of whether or not they were assigned a cell in the same portion of a housing unit as Ms. Toleafoa and Ms. Smith, and that Plaintiff Barclay was likely to be burned or stabbed by one of their associates unless DWCF staff took measures to protect Plaintiff Barclay.

49.    Lieutenant Ruiz conveyed Plaintiff Barclay's concerns to Defendants Long and Mestas.

50.    Neither Defendant Long nor Defendant Mestas took any action to investigate these threats or protect Plaintiff Barclay.

51.    Instead, because Defendants moved Plaintiff Barclay out of Housing Unit 5D— where Ms. Toleafoa and Ms. Smith were also assigned cells—right after Ms. Toleafoa's attack, Ms. Smith and Ms. Toleafoa suspected that Plaintiff Barclay had "snitched" on them regarding this earlier attack.

52.    Defendant Mestas told Ms. Smith and Ms. Toleafoa that Plaintiff Barclay was a "snitch" and/or had snitched on them.

53.    At the time, like all corrections staff, Defendant Mestas had received training and had experience that informed her that those labeled a "snitch" in the prison made them a target of abuse at the hands of others with whom they are incarcerated and who believe snitches deserve

physical reprisal and/or punishment.

54.    Ms. Smith, Ms. Toleafoa, and Ms. Harrison all had a close relationship with Defendant Mestas. They regularly participated in an open mic activity run by Defendant Mestas.

55.    Defendant Mestas favored those who participated in this open mic activity. She would gossip with those individuals about others incarcerated at DWCF.

56.    Accordingly, Defendant Mestas was aware that in association with her open mic activity, multiple women, including Ms. Smith, wrote hateful songs about Plaintiff Barclay, identifying Plaintiff in their lyrics by Plaintiff's visible tattoos and generally insulting Plaintiff and/or making derogatory statements about Plaintiff.

57.    Defendant Mestas knew that labeling and/or confirming that Plaintiff Barclay was or had snitched on other incarcerated people would make Barclay a target of physical violence.

58.    Defendant Mestas deliberately exposed Plaintiff Barclay to a substantial risk of serious harm at the hands of other incarcerated people by labeling Plaintiff Barclay a "snitch." The risk was only amplified by Defendant Mestas telling this to the very people she knew sought violence against Plaintiff Barclay.

59.    Ms. Smith and Ms. Toleafoa told Plaintiff Barclay that they knew from Defendant Mestas that Barclay was a "snitch."

60.    Knowing they had been labeled a snitch, Plaintiff Barclay was afraid each day that they would be seriously harmed or even killed at the hands of others with whom they were incarcerated because of this label or reputation for being a snitch.

61.    And, from then on, Ms. Smith and Ms. Toleafoa made very clear to Plaintiff

Barclay every time they saw each other in the prison, that when Defendants moved Plaintiff Barclay to close custody (as was likely based on CDOC's point and custody classification system), Ms. Smith and Ms. Toleafoa would have one of their friends and/or associates attack Plaintiff Barclay.

***Plaintiff Barclay is Informed of Their Transfer to Close Custody and Gives Defendants Notice of Substantial Risk of Serious Harm***

62.     On August 16, 2023, at approximately 9:30 a.m., Defendant Johnson came to Plaintiff Barclay's cell door in Housing Unit 5 and informed them that they had to pack their things to be transferred to close custody, which was in Housing Unit 3.

63.     Over the next several minutes, Detective Johnson repeatedly returned to Plaintiff Barclay's cell, and stood outside their door to rush them to complete their packing.

64.     Plaintiff Barclay took the opportunity to tell Defendant Johnson that Plaintiff had received multiple threats from Ms. Smith and Ms. Toleafoa, who were known to be Bloods, and that if Defendants moved Plaintiff Barclay to close custody, Plaintiff would be attacked by one of the Bloods or one of their friends/associates.

65.     Defendant Johnson responded, "Well, I can't do anything about that. I'm just a C.O. [corrections officer]; you'll have to talk to [Captain] Checkush."

66.     Defendant Johnson took no action to investigate the threats or to protect Plaintiff Barclay.

67.     At that point, Plaintiff Barclay left their cell, looking for Captain Checkush, who was the captain over Housing Unit 5 at the time, but Barclay couldn't find her.

68.     Plaintiff Barclay then left Housing Unit 5 to intercept Defendant Mestas, who was

crossing the recreation yard from Main Control to Housing Unit 3, as she usually did at that time of day.

69.    Plaintiff Barclay walked with Defendant Mestas as Plaintiff told the captain that they had received threats and were very scared that they would be attacked by someone close with Ms. Smith and/or Ms. Toleafoa upon being moved to close custody.

70.    Defendant Mestas would have been familiar with Ms. Smith, Ms. Toleafoa, and their friends and associates from the open mic night activities. Defendant Mestas was also aware of these women's shared gang membership.

71.    Defendant Mestas continued walking as she told Plaintiff Barclay, "I don't care. I don't have time for this, and I have to go."

72.    Defendant Mestas left Plaintiff Barclay standing outside of Housing Unit 3, without taking any action to investigate or to protect Plaintiff.

73.    Plaintiff Barclay turned back to where they had come from, and sought out Defendant Wilcoxin in his upstairs office of the Programs Building.

74.    Plaintiff Barclay had previously told Defendant Wilcoxin (at approximately the end of July, beginning of August), "I'm having problems with girls in my unit—Smith and Toleafoa, and they'll have someone jump me in close custody," but Defendant Wilcoxin just said that they weren't moving Plaintiff Barclay to close custody yet. This only delayed the inevitable.

75.    On August 16, 2023, in Defendant Wilcoxin's office, Plaintiff Barclay alerted Defendant Wilcoxin to Plaintiff's imminent transfer to close custody and told Defendant Wilcoxin, "I can't go there; I'm afraid to go there—afraid for my safety." Plaintiff explained, "The situation

with Smith has escalated into all of her friends, and they're going to hurt me."

76.     Defendant Wilcoxin told Plaintiff Barclay, "I don't know what to tell you. I'm busy; I need you to leave."

77.     Defendant Wilcoxin did not take any action to investigate the threats or to protect Plaintiff Barclay.

78.     Plaintiff Barclay left Defendant Wilcoxin's office crying. Plaintiff went back downstairs and recounted the interaction to their girlfriend (who was also incarcerated at DWCF) while they sat just outside of the west side of the chow hall.

79.     It was not long before count, at approximately 10:00 a.m., on August 16, 2023, when Defendant Davis approached and told Plaintiff Barclay and their girlfriend that they would need to go back to their cells for count.

80.     Plaintiff Barclay then reiterated their situation with Ms. Smith, Ms. Toleafoa, and the Bloods. Referring to these women, Plaintiff Barclay told Defendant Davis, "I can't go to close custody, Davis; I can't go. You know all these girls are friends, and they all run together."

81.     Plaintiff Barclay also told Defendant Davis, "They were threatening me and are gonna have someone get me in close custody—they said they'd have someone stab or burn me."

82.     Defendant Davis told Plaintiff Barclay, "I understand, but just try to avoid the situation—stay in your room; keep your head down."

83.     Plaintiff Barclay responded that Plaintiff and these women are all scheduled to go to the chow hall together, and Plaintiff Barclay had been attacked before—hit on the back of their head with a food tray—on their way to chow by another one of Ms. Smith and Ms. Toleafoa's

friends, "King" Dominguez.

84.     Plaintiff Barclay explained to Defendant Davis how that last time that Plaintiff told the officers they were going to get assaulted, Plaintiff was assaulted shortly thereafter, and that Ms. Dominquez had hit Plaintiff on the head because Defendant Mestas told Ms. Dominguez that Plaintiff had snitched on Ms. Dominguez about a hateful rap Ms. Dominguez had written about Plaintiff Barclay for open mic.

85.     In response, Defendant Davis just said that they had to get ready for count.

86.     Plaintiff Barclay asked Defendant Davis to please talk to the warden, Defendant Long about the issue, and Defendant Davis told Barclay that he would. This conversation took place on the west side of the chow hall.

87.     Defendant Davis did tell Defendant Long about the substantial risk of serious harm Plaintiff Barclay faced because of Defendants moving Plaintiff to close custody with members of the Bloods or people who were otherwise friends or associates of Ms. Smith and Ms. Toleafoa, but neither Davis nor Long took any action to protect Plaintiff Barclay.

88.     At approximately 10:25 a.m., as Plaintiff Barclay was returning to their cell in Unit 5 for the 10:30 a.m. count, Plaintiff saw Defendant McCarthy crossing the yard from the east side.

89.     Plaintiff Barclay spoke with him in the yard and told him, "I'm scared of going to close custody."

90.     Defendant McCarthy stated, "You're not going to close custody."

91.     Plaintiff Barclay then replied, "Yeah, I am, and I'm scared someone is going to burn or stab me—one of Smith or T's [Toleafoya's] friends."

92.     In response, Defendant McCarthy said, "You're not even going to close custody; just stop."

93.     Again, Plaintiff Barclay repeated, "Yes, I am; they told me I'm going," but Defendant McCarthy just walked off.

94.     Defendant McCarthy did nothing to investigate the threats against Plaintiff Barclay or to protect them from harm either when he knew Defendants would soon move Plaintiff to close custody, or when he knew Defendants had moved Plaintiff to close custody.

*Unit 3 – Close Custody and the Final Assault on Plaintiff Barclay*

95.     Later that afternoon on August 16, 2023, the Defendants moved Plaintiff Barclay to the close custody unit, Housing Unit 3.

96.     DWCF's Housing Unit 3 has three tiers, each with twelve cells that hold up to two people per cell. No more than one and a half tiers-worth of people in close custody are let out of their cells at once, meaning there are no more than thirty-six people in close custody who are let out of their cells at the same time for what is called "pod time."

97.     Tore Harrison, a known friend and/or associate of Ms. Smith and Ms. Toleafoa, in addition to being a known member of the Bloods, was assigned to a cell in Housing Unit 3.

98.     Defendant Mestas was involved with Plaintiff Barclay's move and knew that Plaintiff was in immediate danger because of the past communications, warnings, and other facts identified above.

99.     Defendant Mestas assigned Plaintiff to a specific cell in Housing Unit 3.

100.    Therefore, Defendant Mestas also chose which tier in Housing Unit 3 that Plaintiff

was assigned to, thereby determining the group of people with whom Plaintiff would be let out of their cell to have "pod time."

101.    Defendant Mestas assigned Plaintiff to a cell that was grouped with Ms. Harrison's cell, such that the individuals in those cells would be let out together for "pod time."

102.    None of the defendant officers—all of whom knew that Plaintiff Barclay was likely to be attacked in close custody, knew that Barclay's attacker was likely to be associated with Ms. Smith, Ms. Toleafoa, and/or the Bloods, and knew that the attacker was likely to burn or stab Plaintiff Barclay while in close custody—took any steps to identify such persons in close custody and protect Plaintiff Barclay from them.

103.    After the incarcerated population was locked down in their cells for the night on August 16, 2023, Plaintiff Barclay's new cellmate let them know that the threat against Plaintiff would likely be carried out by Tore Harrison.

104.    The next morning, August 17, 2023, at 7:00 a.m., when Defendant Wood made his rounds in Unit 3, Plaintiff Barclay told Defendant Wood that they were going to be attacked by Ms. Harrison, who was known to be friends with Ms. Smith and Ms. Toleafoa, as well as a member of the Bloods.

105.    Plaintiff Barclay asked Defendant Wood to be switched to a portion of the Unit 3 tiers, the occupants of which would not be let out of their cells at the same time that Ms. Harisson was.

106.    Defendant Wood told Plaintiff Barclay, "Mestas put you in that room for a reason," and then asked why Plaintiff Barclay thought they were going to be attacked, which Plaintiff

Barclay explained yet again.

107.    Defendant Wood denied Plaintiff Barclay's request to move.

108.    He indicated that he believed—completely unfoundedly—that Plaintiff Barclay was making up a story about threats against themselves in an effort to be placed on a tier with someone Plaintiff Barclay wanted to pursue romantically.

109.    Defendant Wood took no action to investigate the threats or to protect Plaintiff Barclay.

110.    About one hour later, at approximately 8:00 a.m. on August 17, 2023, another person incarcerated on Plaintiff Barclay's unit called for Plaintiff to come look out a window in the unit.

111.    Plaintiff Barclay, believing and hoping that it would be their actual girlfriend there to wave to them, went to look out the window.

112.    Plaintiff Barclay then heard someone call their name, and when Plaintiff turned back to look for the source, Plaintiff saw a cup of liquid in Ms. Harisson's hand, which Ms. Harisson then threw on Plaintiff Barclay, hitting the right side of Plaintiff's face, neck, and upper chest, as well as their right arm.

113.    The liquid was boiling hot water and another substance mixed together.[2]

114.    The liquid immediately began to burn Plaintiff Barclay's skin.

115.    After throwing the boiling liquid on Plaintiff Barclay, Ms. Harrison continued to

---

[2] Plaintiff Barclay was later informed that the boiling liquid was a mixture of water and petroleum jelly.

attack Plaintiff Barclay with her hands—choking and punching Plaintiff Barclay while about ten to fifteen corrections officers under the command of Defendant Mestas—and including Defendant Wood—stood by watching.

116.    Ms. Harisson told Plaintiff Barclay, as she was attacking them, that she was doing so "for Smith and T [Toleafoa]," and because, "Mestas said you were a snitch."

117.    When Ms. Harrison finally let up her attack, Plaintiff Barclay fled to their cell to escape.

***The Immediate Response (or Lack Thereof) to Plaintiff Barclay's Serious Burns***

118.    Officers followed Plaintiff Barclay to their cell, handcuffed them, and brought them first to a "dry cell" in DWCF's intake area (a cell without plumbing), and then to DWCF's medical clinic.

119.    When Plaintiff Barclay arrived at DWCF's medical clinic, they were crying and screaming in pain.  Plaintiff was begging for help, including to be sent to a hospital emergency room because of the severity of their injury and their need for immediate medical attention.

120.    Plaintiff Barclay was visibly wet and sticky from the boiling liquid mixture with which they had been attacked—their short-sleeved shirt sticking to the right side of their body.

121.    Plaintiff Barclay's exposed skin—the right side of their face, the right side of their neck, and portions of their right arm down to their elbow—was visibly bright red, blistering, and peeling off such that a puddle of skin had melted down and pooled at the bend of their elbow.

122.    As was clear to anyone looking at Plaintiff Barclay, Plaintiff was suffering from severe burns—at least second-degree or "partial-thickness," ones across the affected area, as well

17

as third-degree or "full thickness" burns in specific areas.[3]

123.    Defendant Jamie, who was working in DWCF's medical clinic, observed all of this, assessed Plaintiff Barclay, and told them that there was no need for a hospital visit because, as she rhetorically asked, "What can a hospital do that we can't?"

124.    Neither Defendant Jamie nor any other person at DWCF gave Plaintiff Barclay anything to relieve the pain, nor did they clean the burning liquid off of Plaintiff or run Plaintiff's burns under cool water, as would be the standard way to respond to a burn.

125.    It took until about an hour and a half after the attack for someone to remove Plaintiff Plaintiff's shirt which was plastering the burning substance to their body.

126.    All of this was despite Defendant Jamie knowing that Plaintiff Barclay had burn scars and sensitive skin on their chest and arm from a childhood accident.

127.    Defendant Jamie did eventually call an ambulance for Plaintiff Barclay, but she called for a non-emergency one.

128.    Because of this, the ambulance did not arrive until approximately 10:00 a.m., or about two hours after Plaintiff Barclay had been attacked.

129.    Plaintiff Barclay sat, crying, in excruciating pain—with their burns untreated—for approximately two hours.

---

[3] Burn injuries are separated into three categories: (1) superficial or first-degree burns, (2) partial-thickness or second-degree burns, and (3) full-thickness or third-degree burns. Cleveland Clinic, "Burns," Jan. 13, 2025, https://my.clevelandclinic.org/health/diseases/12063-burns. First-degree burns are minor and only damage the top layer of skin, while second- and third-degree burns are major burns; second-degree damage the top couple of layers of skin and often blister, and third-degree burns destroy all layers of skin down to the fatty tissue beneath. *Id.*

130.    When the ambulance arrived, the paramedics demanded to know why the call had been for a non-emergency, as opposed to an emergency, ambulance.

131.    The paramedics, recognizing the severity of Plaintiff Barclay's burns and the serious risk of harm they posed to Plaintiff Barclay to go untreated, rushed Plaintiff to the emergency room closest to DWCF—UCHealth Emergency Care at the Anschutz Medical Campus—because it was about ten minutes away,  while it would have taken approximately twenty to thirty minutes to get from DWCF to Denver Health (where Defendant Jamie requested Plaintiff be sent because that's where people incarcerated at DWCF typically go).

132.    As a result of Defendant Jamie's negligence in treating Plaintiff Barclay's severe burns, and as a result of the delay in care caused by Defendant Jamie, Plaintiff Barclay's pain was prolonged and increased, and they ultimately suffered burns more severe than they otherwise would have. This includes third degree burns on the parts of Plaintiff's body where their shirt touched and remained plastering the burning liquid to their skin while the rest of the afflicted parts of their body had second degree burns.

133.    Because of this, Plaintiff Barclay spent two painful weeks in the hospital and had to have skin graft procedures on the places where their shirt was left sticking to their body, which further resulted in extensive scaring not only where Plaintiff was burned, but also where medical professionals had to remove skin from their legs to replace the skin on their upper body that had burned away.

134.    In these circumstances, the defendant officers' failure to protect Plaintiff Barclay from the August 17, 2023, attack demonstrated deliberate indifference to Plaintiff's health and

safety, resulting in Plaintiff being the victim of the very attack of which they warned at least seven DWCF officers.

135.    Additionally, Plaintiff Barclay was forced to endure extreme and obvious pain from clearly severe burns, the lack of prompt medical care for which resulted in even more severe burns than they would have otherwise experienced, as well as more taxing measures for recovery (i.e. skin grafts). This was due to the defendant medical provider, Defendant Jamie's, negligence.

136.    Plaintiff Barclay has exhausted all available administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

137.    Plaintiff Barclay filed timely grievances regarding both the failure to protect and the inadequate medical care incidents described herein, and pursued these grievances through all available levels of CDOC's grievance system.

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983, Eighth & Fourteenth Amendments to the United States Constitution**
***Failure to Protect***
**(Defendants Long, Mestas, Wood, Wilcoxin, Davis, McCarthy, and Johnson)**

138.    Plaintiff Barclay incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

139.    Prison officials have a duty to protect people who are incarcerated from violence at hands of other incarcerated people.

140.    At all relevant times, the law was clearly established that prison officials violate the Eighth Amendment when they are deliberately indifferent to a substantial risk of serious harm to an incarcerated person.

141.    It was also clearly established that when officials are specifically informed of

threats of violence from identified sources, they must take reasonable protective measures.

142.    In the months before Ms. Harrison attacked Plaintiff Barclay on August 17, 2023, Plaintiff Barclay gave the defendant officers notice that should Plaintiff be placed in close custody, they would face a substantial risk of serious harm—that friends or associates of Ms. Smith, Ms. Toleafoa, and/or the Bloods would likely try to stab, burn, or otherwise hurt Plaintiff Barclay.

143.    Defendants Long, Mestas, Wood, Wilcoxin, Davis, McCarthy, and Johnson (the defendant officers) did nothing to address this concern; they failed to protect Plaintiff Barclay from this substantial risk of serious harm, and, therefore, violated Plaintiff's constitutional rights.

144.    Defendant Long's liability is based on his direct personal participation in the constitutional violation, and not merely his supervisory position.

145.    Defendant Long received notice of the identity of an individual involved in targeting Plaintiff Barclay for attack, as well as the specific means of attack, but he hastily concluded—without speaking with Plaintiff about the threat or instructing any of his staff to do so—that there was no evidence of such a threat against Plaintiff.

146.    As the warden, Defendant Long could have taken the following reasonable measures to protect Plaintiff: (1) transferred Plaintiff to a different housing unit or facility separate from those who had threatened to harm Plaintiff and separate from those people's associates, (2) placed those who had threatened to harm Plaintiff and other known Bloods members on different programming, recreation, and "pod time" schedules than Plaintiff, (3) ensured closer supervision during times when Plaintiff and known threats were in the same area.

147.    Defendant Long took none of the above reasonable measures, nor any other

reasonable measures, to protect Plaintiff Baclay.

148.    From the moment Plaintiff Barclay knew they were being moved to close custody, Plaintiff frantically sought out every correctional officer they could to give them notice—in detail—of the likely imminent attack against them and to ask the officers for protection.

149.    Again, the defendant officers did not protect Plaintiff Barclay. The defendant officers told Plaintiff Barclay that they "didn't care," that they were "busy," that it was above their paygrade, and that Plaintiff was making stuff up.

150.    When Plaintiff Barclay gave Defendant Johnson notice of the threatened attack against Plaintiff, Defendant Johnson acknowledged it was an issue such that Plaintiff should talk to a captain, but he claimed he couldn't do anything to help.

151.    When Plaintiff Barclay gave notice of the threatened attack to Defendant Mestas— a captain familiar with members of the Bloods' history of targeting Plaintiff for harm—Defendant Mestas said, "I don't care. I don't have time for this, and I have to go."

152.    Not only did Defendant Mestas fail to take any reasonable actions to protect Plaintiff Barclay, hours later, Defendant Mestas facilitated Plaintiff's move to close custody, during which Defendant Mestas gave Plaintiff a cell assignment that meant that Plaintiff would have to share time outside of their cell with Ms. Harrison—a known friend and/or associate of Ms. Toleafoa's and Ms. Smith's, a member of the Bloods, and someone who believed that Plaintiff was a snitch because Defendant Mestas had made such representations.

153.    Defendant Wilcoxin similarly responded to Plaintiff Barclay's repeated and specific pleas for help with, "I don't know what to tell you. I'm busy; I need you to leave."

154.    Defendant Davis, meanwhile, in response to the same information about an imminent attack against Plaintiff once Defendants moved Plaintiff to close custody, told Plaintiff that he understood the situation, but that it was effectively up to Plaintiff to keep themselves safe.

155.    Defendant Davis told Defendant Long about the threats against Plaintiff Barclay, but he did nothing else that could conceivably be considered as investigating the serious threat or protecting Plaintiff from the significant risk of serious harm that Plaintiff faced.

156.    Defendant McCarthy, similarly did nothing to investigate the threats against Plaintiff Barclay or protect them from harm, even though he knew of Plaintiff being threatened with being burned by one of Ms. Smith and Ms. Toleafoa's friends and/or associates in close custody.

157.    None of the defendant officers—all of whom knew that Plaintiff Barclay was likely to be attacked in close custody, knew that Barclay's attacker was likely to be associated with Ms. Smith, Ms. Toleafoa, and/or the Bloods, and knew that the attacker was likely to burn or stab Plaintiff Barclay while in close custody—took any steps to identify such persons in close custody and protect Plaintiff Barclay from them.

158.    Of the approximately 700 people incarcerated at DWCF at the time, there were only thirty-five incarcerated people or who could have potentially attacked Plaintiff Barclay during "pod time" in the close custody unit, and still, the defendant officers failed to take reasonable measures to investigate the serious threats against Plaintiff or to protect Plaintiff from the significant risk of serious harm.

159.    In speaking with Defendant Wood, Plaintiff Barclay was even able to identify their

soon-to-be-attacker as Tore Harrison (in addition to the attacker's means, location, and affiliation), but Defendant Wood also failed to take any reasonable measures to investigate the threat or protect Plaintiff Barclay.

160.    This included Defendant Wood denying Plaintiff's direct request to Defendant Wood to be moved to a portion of Housing Unit 3 that was separate from Ms. Harisson.

161.    None of the defendant officers made any attempt to separate Plaintiff Barclay from known friends and associates of Ms. Smith, Ms. Toleafoa, and the Bloods (those who had previously threatened and attacked Barclay) like Ms. Harrison, even when Plaintiff Barclay identified Ms. Harrison as the likely assailant just an hour before the attack.

162.    The defendant officers also knew of the specific danger posed by relatively unfettered access to a microwave in close custody, as another incarcerated individual had recently been attacked with boiling water heated in that microwave, and both Plaintiff Barclay and their mother let the defendants know of the significant risk that those attacking them would burn them.

163.    But the defendant officers failed to act on that knowledge and take reasonable measures to safeguard Plaintiff Barclay from the substantial risk of being seriously burned.

164.    Defendants Long, Mestas, Wood, Wilcoxin, Davis, McCarthy, and Johnson were all acting under the color of state law when they disregarded and were deliberately indifferent to the substantial risk of serious harm to Plaintiff Barclay and failed to act reasonably to prevent Plaintiff Barclay from being physically assaulted while the defendant officers were responsible for Plaintiff's wellbeing. This is a violation of the prohibition against cruel and unusual punishment found in the Eighth Amendment to the U.S. Constitution.

165.    These defendants' failure to protect Plaintiff Barclay in light of the significant risk of serious harm for which they were put on notice, deprived Plaintiff Barclay of their constitutional rights, privileges, liberties, and immunities, and was a motivating and proximate cause of Plaintiff Barclay's physical injuries and ailments, pain and suffering, mental anguish, emotional distress, permanent injuries, and medical bills.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983, Eighth & Fourteenth Amendments to the United States Constitution**
***State-Created Danger to Plaintiff's Health and Safety***
**(Defendants Mestas)**

166.    Plaintiff Barclay incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

167.    As a member of DWCF's incarcerated population, Plaintiff Barclay's safety and general well-being was Defendant Mestas' responsibility.

168.    It was with deliberate indifference to Plaintiff Barclay's personal health and safety that Defendant Mestas intentionally exposed Plaintiff Barclay to great fear and risk of harm at the hands of other incarcerated people when she directly communicated to others incarcerated at DWCF that Barclay was a "snitch."

169.    Defendant Mestas' intentional labeling of Plaintiff Barclay as a "snitch" directly resulted in the attack by Ms. Harrison, as demonstrated by Ms. Harrison's contemporaneous statement during the attack that she was attacking Plaintiff because "Mestas said you were a snitch."

170.    Defendant Mestas told multiple incarcerated people—including Ms. Harrison, Ms. Smith, and Ms. Toleafoa—that Plaintiff Barclay had "snitched" and/or was a "snitch."

171.    Defendant Mestas knew that the label or reputation of being a "snitch," in the prison context, makes a person vulnerable to and the target of attacks by other incarcerated people.

172.    They way Defendants Mestas wielded such a label with respect to Plaintiff Barclay was appallingly deliberate in her disregard for the obvious impacts it would likely have on Plaintiff's health and safety and created the very danger that harmed Plaintiff Barclay.

173.    Defendant Mestas' deliberate action of labeling Plaintiff Barclay a "snitch," knowing the severe danger this placed Plaintiff in, demonstrates a degree of outrageousness and a magnitude of potential or actual harm that truly shocks the conscious.

174.    Plaintiff Barclay suffered psychological injury due to the fear of harm to which Defendant Mestas deliberately exposed them, as well as physical injury when Plaintiff was ultimately attacked by an individual who had heard from Defendant Mestas that Plaintiff was a snitch.

175.    Defendant Mestas was also deliberately indifferent to the Plaintiff Barclay's health and safety when she deliberately endangered Plaintiff by assigning Plaintiff a cell in close custody that she knew would result in Plaintiff having to share their out-of-cell time with Ms. Harrison, a known Bloods member, a known associate and/or friend of Ms. Smith and Ms. Toleafoa, and a person Defendant Mestas had told about Plaintiff being a "snitch."

176.    Defendant Mestas' deliberate indifference to Plaintiff Barclay's personal health and safety—while acting under color of state law—deprived Plaintiff Barclay of their constitutional rights, privileges, liberties, and immunities, and was a motivating and proximate cause of Plaintiff Barclay's physical injuries and ailments, pain and suffering, mental anguish, emotional distress,

permanent injuries, and medical bills.

### THIRD CLAIM FOR RELIEF
**Common Law Negligence**
**(Defendant Jamie)**

177.    Plaintiff Barclay incorporates by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

178.    On August 17, 2023, Defendant Jamie was responsible for Plaintiff Barclay's medical care while they were in custody at DWCF.

179.    Defendant Jamie was a medical provider who was independently authorized to practice medicine by the State of Colorado and independently responsible for all medical decisions made regarding Plaintiff Barclay while at DWCF.

180.    Defendant Jamie was not merely following government directives while treating— or failing to treat—Plaintiff Barclay, and therefore, government contractor immunity does not apply.

181.    The Colorado Governmental Immunity Act does not bar Plaintiff's claim against Defendant Jamie because (1) she was an independent contractor exercising independent medical judgment, not a public employee; and (2) even if considered a public employee, her conduct in failing to provide basic emergency medical care for severe burns constitutes willful and wanton conduct excepted from immunity under C.R.S. § 24-10-118(2)(a).

182.    Defendant Jamie had a duty to provide care to Plaintiff Barclay. She had a medical provider-patient relationship with Plaintiff Barclay and was acting within the scope of her employment.

183.    These duties of care are informed by state law.  Under Colo. Rev. Stat. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

184.    CDOC's Administrative Regulation No. 700-01(IV)(C)(6) also requires all of its facility employees and contract workers to be trained in both the "[r]ecognition of signs and symptoms, and knowledge of action required in potential emergency situations," and "[a]dministration of basic first aid."

185.    Further, CDOC's Administrative Regulation No. 700-02(IV)(B) states that, "Medical services will be provided in a manner that … ensures the maintenance of basic health and prevention of health deterioration," including emergency medical care and assessment.

186.    When Plaintiff Barclay was brought to DWCF's medical clinic shortly after 8:00 a.m. on August 17, 2023, Defendant Jamie knew or should have known that Plaintiff Barclay had had a boiling liquid thrown over their body.

187.    Defendant Jamie knew or should have known that Plaintiff Barclay had been severely burned, was likely experiencing second- and third-degree burns, and needed immediate emergency medical attention.

188.    When Plaintiff Barclay arrived at DWCF's medical clinic, Plaintiff was crying and screaming in pain; begging for help, including to be sent to the emergency room; visibly wet from the boiling liquid mixture with which they had been attacked—their shirt sticking to the right side of their body; and their exposed skin—the right side of their face, neck, as well as portions of their

right arm—was bright red, blistering, and peeling off.

189.    Defendant Jamie nevertheless failed to address Plaintiff Barclay's injuries. This was negligence on Defendant Jamie's part.

190.    Unlike many other medical conditions, a burn's severity is easily observable, and any medical professional, including Defendant Jamie, would have been aware of the serious medical needs associated with severe burns, and the serious risk of harm associated with failing to promptly and adequately treat burns as severe as Plaintiff Barclay's.

191.    As a medical professional, Defendant Jamie knew or should have known that the applicable standard of care for severe burns includes: (1) immediate removal of the burning substance, (2) immediate removal of clothing or other materials adhering to the burned area; (3) immediate cooling of the burned area, using water; (4) administration of appropriate pain medication; (5) prompt assessment of burn severity and percentage of body affected; and (6) immediate transfer to an emergency medical facility for second- and third-degree burns covering more than a minimal area of the body.

192.    This is well-known in the medical profession, as well as to those who have been trained in basic first aid.

193.    Despite the obviously serious injury and extreme pain that Plaintiff Barclay was suffering, and despite the risk of allowing Plaintiff Barclay's burns to become more severe and infected if not immediately addressed, Defendant Jamie negligently denied Plaintiff Barclay medical care.

194.    Defendant Jamie did not clean off or otherwise remove the burning liquid sticking

to Plaintiff Barclay's body, nor did she instruct anyone else to do so.

195.    Defendant Jamie did not immediately remove Plaintiff Barclay's shirt from where it was plastered to Plaintiff's body, covering and worsening the burn.

196.    Plaintiff Barclay's shirt was not removed from the burn until approximately an hour and a half after Plaintiff was attacked.

197.    Defendant Jamie knew or should have known that cleaning off the burning substance and removing the clothing touching Plaintiff's burn and continuing to press the burning liquid into Plaintiff's skin, would have limited the burn's severity in those areas.

198.    Defendant Jamie did not treat Plaintiff Barclay's burns with cool water, nor did she instruct anyone else to do so.

199.    Defendant Jamie did not administer any pain medication to Plaintiff Barclay, nor did she instruct anyone to do so, despite Plaintiff screaming and crying in pain.

200.    Defendant Jamie did not promptly assess the severity of Plaintiff Barclay's burns on all affected areas of Plaintiff's body, nor did she promptly assess the full scope of Plaintiff's burns—the percentage of Plaintiff's body that was affected, for Defendant Jamie would have had to remove Plaintiff's shirt to do so, and she did not do that for about an hour and a half after the attack.

201.    Having observed that Plaintiff Barclay had severe burns covering more than a minimal part of Plaintiff's body, Defendant Jamie also refused to facilitate Plaintiff Barclay's immediate transfer to an emergency medical facility.

202.    Instead, Defendant Jamie rhetorically asked Plaintiff Barclay, "What can a hospital

do that we can't?" when Plaintiff asked to be taken to an emergency room.

203.    When Defendant Jamie did eventually call an ambulance for Plaintiff Barclay, she called for a non-emergency ambulance. Because of this, the ambulance did not arrive until approximately 10:00 a.m., or about two excruciating and treatment-free hours after Plaintiff Barclay had been attacked.

204.    When the non-emergency ambulance arrived, the paramedics were incredulous that an emergency ambulance had not been summoned immediately; they recognized the severity of Plaintiff Barclay's burns and the serious risk of harm they posed to Plaintiff Barclay to continue to go untreated.

205.    Defendant Jamie failed to act in conformity with the standard of care due to Plaintiff Barclay.

206.    Defendant Jamie breached her duty of care owed to Plaintiff Barclay by negligently evaluating and failing to treat Plaintiff Barclay, as well as preventing Plaintiff Barclay from promptly receiving emergency services from outside medical professionals.

207.    Defendant Jamie willfully, wantonly, and affirmatively acted or refused to act in reckless disregard for the rights and safety of Plaintiff Barclay.

208.    Plaintiff Barclay's medical condition and pain and suffering became more severe as a result of Defendant Jamie's negligence.

209.    As the direct and proximate result of Defendant Jamie's actions, omissions, and failure to act in accordance with appropriate standards of care, Plaintiff Barclay experienced physical injuries and ailments, pain and suffering, mental anguish, emotional distress, permanent

injuries, and medical bills.

210.    Defendant Jamie's acts and/or omissions were a substantial cause of Plaintiff Barclay's pain and suffering, and other consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Barclay respectfully prays that this Court enter judgment in their favor and against the Defendants for compensatory damages, punitive damages, interest as allowed by law, costs, expert witness fees, reasonable attorney fees as allowed by statute or as otherwise allowed by law, pre- and post-judgment interest, and for any other and further relief that this Court deems just and proper.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 16th day of May, 2025.

*s/   Audrey DeRose Oliver*

Audrey DeRose Oliver, No. 60885
Raymond K. Bryant, No. 42586
Civil Rights Litigation Group
1543 Champa Street, Suite 400
Denver, Colorado 8020
P: (720) 515-6165
F: (720) 465-1975
audrey@rightslitigation.com
raymond@rightslitigation.com
*Attorneys for Plaintiff*
